George L. WHITLOCK, Plaintiff,

v.

Raymond J. DONOVAN and United States Department of Labor, Defendants.

Civ. A. No. 83–3388.

United States District Court, District of Columbia.

Nov. 6, 1984.

Francis R. Ridley, Jr., Thomas Earl Patton, Washington, D.C., for plaintiff.

Daniel Bensing, Sp. Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

This case concerns an alcoholic employee who was terminated from his federal employment because his condition caused him to be frequently and unexpectedly absent from work and eventually seriously interfered with his otherwise satisfactory performance of his duties. Claiming that the Department of Labor failed to make "reasonable accommodation" to his condition before firing him, plaintiff seeks reinstatement and back pay. The Court has jurisdiction under the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16. The Court conducted a trial *de novo* of plaintiff's discrimination claim,[1] and this Memorandum constitutes the Court's findings of fact and conclusions of law.

## I. Introduction

Plaintiff was fired by the Department of Labor in May 1983, because of repeated absences after various efforts had been made to counsel him toward treatment for his alcoholism. Whitlock was a GS–6, step 8 supervisor who had had 23 years of federal service prior to his discharge. Other than alcoholic absences his work performance was not only satisfactory but often deemed superior.

There is no dispute that plaintiff is an alcoholic. He joined the Department of Labor in 1975 but indeed had been an alcoholic since the age of 10. An alcoholic has a disease. He is the victim of a handicap which becomes progressively worse unless successfully treated. Alcoholics typically deny their handicap and conceal, excuse and even lie about their drinking and the problems it causes them at home and at work. Treatment of alcoholism focuses initially on a basic need to force the alcoholic to recognize his handicap. In employment situations, both private and public, this is usually done by presenting the employee,

---

1. Plaintiff's right to trial *de novo* is established by 29 U.S.C. § 794a, which makes applicable to section 501 handicap discrimination cases the procedures provided by section 717 of the Civil Rights Act of 1964 for federal employees, *see* 42 U.S.C. §§ 2000e–16(c), 2000e–5(f). *See Shirey v. Devine,* 670 F.2d 1188, 1200 (D.C.Cir.1982). In addition, the Civil Service Reform Act expressly provides for trial *de novo* for federal employees alleging handicap discrimination, even where the Merit Systems Protection Board, as in this case, fully adjudicated the claim. *See* 5 U.S.C. §§ 2302, 7702(e)(3), 7703(c).

hopefully at an early stage, with a clear choice between either accepting intervening therapy designed to break the barriers of denial and avoidance or facing the definite loss of job and status.

The nature of the intervening therapy provided varies considerably. There is peer support such as provided by Alcoholics Anonymous and many types of counseling which employ intensive outpatient therapy or a mixture of in-patient care for a period of time followed by careful monitoring on an out-patient basis. All programs require continuous counseling after the initial detoxification, and of course such counseling can only work if the patient is motivated to seek it and to continue it, having accepted that he has an alcoholism problem.

Plaintiff has now been sober for more than a year following seven months of intensive in-patient treatment at St. Elizabeth's Hospital. He contends that the Department of Labor failed in several respects to meet its statutory obligation reasonably to accommodate to his handicap before termination. First, he contends that the Department should have more forcefully presented to him at an earlier stage than it did a clear choice between entering treatment or losing his job. Second, he contends the Department failed to follow up on the treatment he did enter when he stopped attending after a few successful months of therapy. In these two respects, he contends the Department's intervention was "too little, too late." Finally, he contends that when he was fired nearly a year after he stopped the recommended treatment, he was not presented with the reasonable option of taking a long leave without pay for intensive in-patient treatment or accepting disability retirement.

Before reviewing plaintiff's federal employment experience, with particular reference to his alcohol problems, it is necessary to untangle the variety of laws and regulations that establish a federal employer's obligation to its alcoholic employees. That will bring into focus the basis for plaintiff's claims.

## II. Applicable Statutes and Regulations

Alcoholism is a handicapping condition for purposes of the handicap discrimination protections of the Rehabilitation Act of 1973. Both the Attorney General, 43 Op. Att'y Gen. No. 12 (1977), and the Secretary of the then Department of Health, Education and Welfare, 42 Fed. Reg. 22686 (May 4, 1977), have so concluded,[2] and the courts are in accord. *See, e.g., Tinch v. Walters,* 573 F.Supp. 346, 348 (E.D.Tenn.1983); *Simpson v. Reynolds Metals Co.,* 629 F.2d 1226, 1228, 1231 n. 8 (7th Cir.1980); *Davis v. Bucher,* 451 F.Supp. 791, 796 (E.D.Pa.1978). Federal alcoholic employees who are using alcohol excessively are protected only under one section of the Act, Section 501, whereas other federally employed individuals who are handicapped by other conditions or are rehabilitated alcoholics also enjoy the protection of Section 504 of the Act.[3]

2. The Labor Department itself concluded that alcoholism was a handicap covered by the Rehabilitation Act. Plaintiff's Exhibits 36 and 37 (letter from Labor Secretary to Attorney General and news release, respectively).

3. Section 504 provides that

No otherwise qualified handicapped individual, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service....

As amended in 1978, section 706(7) generally defines the term "handicapped individual" and specifies that

For purposes of sections 793 [section 503] and 794 [section 504] of this title as such sections relate to employment, such term does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose employment, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others. Section 706(7)(B). The legislative history indicates that this 1978 amendment was meant to "exclude alcoholics and drug abusers in need of rehabilitation from the definition of 'handicapped individual'" for purposes of employ-

■ Under Section 501 of the Act, federal agency employers such as the Department of Labor have a duty of affirmative action toward handicapped employees and applicants.[4] Indeed, the statute was strengthened in 1978 to make clear that any handicapped federal employee had a private right of action to enforce his right to receive affirmative action. *See* section 505(a), 29 U.S.C. § 794a(a)(1).[5] Members of Congress indicated in 1978 that Section 501 was intended to make the federal government a "leader" or "model employer" of the handicapped.[6] In addition, regulations of the Equal Employment Opportunity Commission under the statute emphasize the general policy of the federal government to "become a model employer of handicapped individuals." 29 C.F.R. § 1613.703. Thus this affirmative-action obligation is more than a requirement of

non-discrimination or even-handed treatment. *See Shirey v. Devine*, 670 F.2d 1188, 1201 (D.C.Cir.1982); *Southeastern Community College v. Davis*, 442 U.S. 397, 410, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979). Federal agency employers are required to make "reasonable accommodation" to the limitations of a handicapped employee unless the agency can show such accommodation would impose an "undue hardship" on its operations. 29 C.F.R. § 1613.704.[7]

■ Additional protection for alcoholic federal employees is found in the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act of 1970. That Act requires federal agencies to have alcoholism treatment programs for their employees. 42 U.S.C. § 290dd–1(a). The Act also provides that "[n]o per-

---

ment discrimination. H.R.Rep. 1149, 95th Cong., 2d Sess. 22–23, *reprinted in* 1978 U.S. Code Cong. & Ad.News 7312, 7333–34. There is no question here that the plaintiff was currently using alcohol and was in need of rehabilitation at the time of the incidents giving rise to this suit. Therefore he is not protected by section 504.

4. Section 501(b) provides in pertinent part:
Each department, agency, and instrumentality ... in the executive branch shall ... submit to the Civil Service Commission ... an affirmative action program plan for the hiring, placement, and advancement of handicapped individuals in such department, agency, or instrumentality. Such plan shall include a description of the extent to which and methods whereby the special needs of handicapped employees are being met....
29 U.S.C. § 791(b).

5. That section provides that
The remedies, procedures and rights set forth in section 717 of the Civil Rights Act of 1964 ... including the application of sections 706(f) through 706(k) ... shall be available, with respect to any complaint under section 791 of this title, to any employee ... aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint. In fashioning an equitable or affirmative action remedy under such section, a court may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy.
29 U.S.C. § 794a(a)(1).

6. See comments of Senators Cranston and Williams, quoted in *Prewitt v. United States Postal Service*, 662 F.2d 292, 301–02 (5th Cir.1981).

7. The text of that regulation is set out in full here:
(a) An agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program.
(b) Reasonable accommodation may include, but shall not be limited to: (1) Making facilities readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.
(c) In determining pursuant to paragraph (a) of this section whether an accommodation would impose an undue hardship on the operation of the agency in question, factors to be considered include: (1) The overall size of the agency's program with respect to the number of employees, number and type of facilities and size of budget; (2) the type of agency operation, including the composition and structure of the agency's work force; and (3) the nature and the cost of the accommodation.
29 C.F.R. § 1613.704 (1984).

son may be denied or deprived of Federal civilian employment ... solely on the ground of prior alcohol abuse or prior alcoholism." 42 U.S.C. § 290dd–1(c)(1). While the Act states that "[t]his section shall not be construed to prohibit the dismissal from employment of a Federal civilian employee who cannot properly function in his employment," 42 U.S.C. § 290dd–1(d), the legislative history indicates that dismissal was intended to apply only to employees who refused treatment altogether or who had repeatedly failed in treatment.[8]

■ These statutes viewed together in the light of their legislative history show Congress's firm intention to require federal employers to exert substantial affirmative efforts to assist alcoholic employees toward overcoming their handicap before firing them for performance deficiencies related to drinking. It is this duty, which is subsumed under the "reasonable accommodation" requirement of Section 501(b) of the Rehabilitation Act and the regulations of 29 C.F.R. § 1613.704, that plaintiff has invoked.

A precise statement of the government's concept of its duty reasonably to accommodate an alcoholic employee cannot be found in any single regulation or personnel directive but can be ascertained from directives scattered through a number of publications of the U.S. Office of Personnel Management. These publications are not altogether consistent or clear, and some of them are advisory while others are mandatory.[9] There is a wide variation in the alcoholism programs of various federal agencies. Some appear to be pro forma while others, such as the Government Printing Office, have extensive programs. This variation possibly reflects both uncertainty in the standards to be applied as well as increasing concern and evolving knowledge about the alcoholism problem in some agencies.

The most extensive statement of reasonable accommodation duties to alcoholic employees is found in Federal Personnel Manual System Supplement 792–2, Alcoholism and Drug Abuse Programs (1980).[10] This provides that where a supervisor suspects alcohol is the reason for poor performance by an employee, the supervisor is directed among other things to

> Conduct an interview with the employee focusing on poor work performance and inform the employee of available counseling services if poor performance is caused by any personal or health problem.

> If the employee [subsequently] refuses help, and performance continues to be unsatisfactory, provide a firm choice between accepting agency assistance

---

**8.** The legislative history of the Act states that: No federal employee should be discriminated against with regard to any facet of his employment because he has an alcohol problem. The committee expects that the alcoholic employee, like any other employee suffering from a disease, will now be provided with an opportunity for treatment instead of being summarily discharged. Government employees with alcohol problems should be dismissed only if they have refused to accept adequate and appropriate treatment offered to them, and have subsequently failed to function properly in their positions. Employees accepting such treatment, but still having difficulty in meeting their responsibilities, should be offered the option of going on sick leave at times of crisis. An employee who has accepted treatment should be dismissed for medical reasons only when he has been granted sick leave, treatment has repeatedly failed, and he is clearly not capable of meeting the demands of his job.

S.Rep. No. 1069, 91st Cong., 2d Sess. 20 (1970). In regard to the specific provision of 42 U.S.C. § 290dd–1(d) allowing for the termination of alcoholic employees, the Senate report indicates that "[t]his section will not prohibit the dismissal of a Federal civilian employee who refuses to accept appropriate treatment offered to him and subsequently does not function properly in his employment." *Id.* at 28.

**9.** *See Doe v. Hampton,* 566 F.2d 265, 281 (D.C. Cir.1977), indicating the need where considering the application of the Federal Personnel Manual to evaluate whether any given statement therein is mandatory or merely precatory.

**10.** The context indicates that the statements quoted below are in the nature of mandatory guidelines, albeit with room for managerial discretion, rather than purely hortatory or precatory.

through counseling or professional diagnosis of his or her problem, and cooperation in treatment if indicated, or accepting consequences provided for unsatisfactory performance.

*Id.* at S2–2. Supervisors are instructed not to raise directly the possibility of a drug or alcohol problem with the employee except where the employee does not seem in full control of his or her faculties or where the employee seems to be involved in criminal conduct. *Id.*[11] Rather, it is contemplated that supervisors will make referrals to trained counselors within the agency or on contract to the agency, where the direct confrontation with the employee about his alcoholism is expected to be made.

▪ Personnel regulations governing handicapped employees who can no longer perform their job duties are, of course, applicable to employees handicapped by alcoholism. In such cases, where the agency cannot reasonably accommodate an employee and at the same time keep him at work, the agency is obligated by the Federal Personnel Manual to consider

(1) A liberal grant of leave without pay when paid leave is exhausted and the disability is of a remediable nature and likely to respond to treatment and hospitalization. Many mental and emotional disorders, formerly considered completely disabling, now fall in this category in view of the dramatic medical advance made in treatment and rehabilitation of these conditions in recent years.

(2) Judicious reassignment to a position with less rigid physical requirements including job engineering when possible to utilize the remaining unimpaired assets of the handicapped employee.

(3) Encouraging the employee who cannot be salvaged but who meets the service requirement for disability retirement (five or more years of civil service employment) to file, or filing application on the individual's behalf particularly if his or her disability is one which impairs his or her judgment and ability to make decisions.

Federal Personnel Manual 339–1–3(b) (May 16, 1979).[12] The defendant Department of

---

**11.** These guidelines further provide that

In practice, the alcoholic or drug abuse[r] should be dealt with little differently from other problem employees. The supervisor identifies the aspects of job performance that are not satisfactory, consults with the medical or counseling staff, or both, about those cases that appear to be developing a trend, discusses aspects of below-standard performance with the employee and advises him or her of availability of counseling assistance if the cause of poor performance stems from any personal problem. If the employee refuses to seek counseling, or if there is no improvement or inadequate improvement in performance, or both, disciplinary actions should be taken, as warranted, solely on the basis of unsatisfactory job performance.

In relating the alcoholism and drug abuse program to disciplinary policies and practices, it is most important that the program be carried out as a nondisciplinary procedure aimed at rehabilitation of persons who suffer from a health problem. There needs to be a clear understanding that shielding problem employees by tolerating poor performance clearly contributes to the progression of the illness by delaying entry into a rehabilitative program. However, failure on the part of the employee to accept the assistance offered through the program or to otherwise correct performance

should be dealt with through disciplinary procedures.

*Id.* at S5–1. The Manager's Handbook issued by the U.S. Office of Personnel Management (Spring 1981 edition; Pl. Ex. 33), which guides federal managers on the requirements of government personnel management, is to the same general effect.

**12.** To similar effect, the Office of Personnel Management also has advised federal agencies that they "have the authority to adopt flexible leave policies that will accommodate handicapped employees," including administrative leave and leave without pay, such as where the employee needs to undertake an extensive rehabilitative program. Handbook of Reasonable Accom[m]odation (March 1980) at 9 (Pl. Ex. 31). Neither the manual nor the handbook speak in terms of "shall" or "must," because the "reasonable accommodation" mandate requires agencies only to consider such alternatives and to evaluate whether they would impose an "undue hardship" on the agency under the regulations of 29 C.F.R. § 1613.704(c). But it is clear an agency may not ignore the alternatives spelled out in the Federal Personnel Manual and has the burden of justifying its decisions not to accommodate where the employee has produced evidence that accommodation was feasible.

Labor's policy is to encourage temporary disability retirement with a one-year right to be rehired as an alternative to leave without pay for those employees "expected to be absent for an extended period because of illness or injury." DLS Subch. 4, FPM 630, Sec. 4–3d (August 1979).

When an agency suspects that deficiencies in an employee's performance, attendance or behavior are caused by a health problem, the agency is required to take steps to confirm a connection between the deficiencies and the health problem before instituting removal. If available medical evidence is insufficient to make a final determination, the agency is required to order a fitness-for-duty examination in the form of a general physical examination, a specialized physical, or a psychiatric examination. The employee may participate in the selection of the medical examiner. A second examination may take place only if the first examiner recommends one. *See* Federal Personnel Manual Supplement 831–1 S10–10a(5) (1978).

The agency then must make a tentative determination "on the basis of all available evidence" whether the deficiencies "are caused by illness or injury." Federal Personnel Manual Supplement 831–1 S10–10a(7) (1980). If not, the agency may institute "adverse action procedures ... if warranted." *Id.* However, if it does find the deficiencies are caused by disease or injury, it must notify the employee in writing,

giving him an opportunity to reply and other rights. After certain other steps, the agency then may apply to the Office of Personnel Management to have the employee retired on disability. *Id.* at S10–10a(8), (9).

▪ Until 1980, disability retirement under these procedures was not available for alcoholic employees because the statutory definition of disability excluded anyone whose disabling disease or injury was "due to vicious habits, intemperance, or willful misconduct." 5 U.S.C. § 8331(6). This exclusion was repealed by Pub.L. 96–499, section 403(b) (1980). The statutory definition of disability, as amended by the same act, now provides

Any employee shall be considered to be disabled only if the employee i[s] found by the Office of Personnel Management to be unable, because of disease or injury, to render useful and efficient service in the employee's position and is not qualified for reassignment ....

5 U.S.C.A. § 8337(a) (1984 Supp.). *See also* 5 C.F.R. § 831.502(a) (conforming regulation).[13]

▪ To summarize, this review of the major statutory and regulatory obligations of federal employers toward their alcoholic employees establishes that when an employee's performance deficiencies are suspected to be due to alcohol, the agency is obligated first to offer counseling to the

---

**13.** In a supplement to the Federal Personnel Manual based on the 1980 statutory changes, the Office of Personnel Management stated that 5 C.F.R. § 831.502 "sets out the conditions that must be met by an employee to be eligible for disability retirement." FPM Letter 831–64, Attachment 2 (April 3, 1981). That section contains no qualifiers regarding an alcoholic employee's eligibility for disability. FPM Letter 751–2 (Feb. 4, 1983) also suggests no special restrictions on an alcoholic employee's eligibility (attachment at 3, 4). However, the repealed statutory definition of disability discussed above disqualifying alcoholics still appears in a section of the Code of Federal Regulations dealing with disability retirement procedures on the application of an agency. *See* 5 C.F.R. § 831.-1203(c)(1). That section has not been amended since the repeal in December 1980. The government also points to an unofficial memorandum

of the Interagency Advisory Group of the Office of Personnel Management (Feb. 3, 1983, at 4). That document states that disability retirement would be available for a medical condition caused by alcoholism, e.g., liver disease, but not for alcoholism itself. The Court can find no statutory or regulatory basis for this distinction. However, it is apparent that when it fired Mr. Whitlock, the Department of Labor was under the impression—understandably, given the lack of clarity from the Office of Personnel Management—that, as the Department advised Mr. Whitlock a month after his discharge, "alcohol dependence in itself is generally not a basis for approval of disability retirement." Pl. Ex. 26. Even if this is or was the policy of the Office of Personnel Management, the Court believes it conflicts with the clear Congressional intent to treat alcoholism as a disease or handicapping condition like any other.

employee. If the employee rebuffs the offer, and if the deficiency in his work is such that discipline would be warranted, the agency should offer a "firm choice" between treatment and discipline. An agency is obligated to follow through with its firm choices. Since it is recognized that relapse is predictable in treatment of alcoholics, an agency is not justified in automatically giving up on an employee who enters treatment but who subsequently relapses. In such a case, the agency may follow through with discipline short of removal. However, the agency is obligated before removing the employee from its work force to evaluate whether keeping the employee presents an undue hardship under 29 C.F.R. § 1613.704. If removal seems to be the only feasible option, the agency is obligated to conduct a formal evaluation, including a fitness-for-duty examination if necessary, to confirm whether the employee's alcoholism disease is in fact responsible for the employee's poor performance. If so, the agency must offer leave without pay if the employee will seek more extensive rehabilitative therapy that seems promising, and the agency must also counsel the employee regarding disability retirement.

### III.  Discussion

With these standards in mind, it is now appropriate to review plaintiff's alcohol-related experience at the Department of Labor.

In 1977, plaintiff had an alcoholic seizure on the job and was taken to a hospital.[14] After some days he returned to work. On the initiative of his then supervisor, plaintiff was referred for counseling, and he participated in an alcoholic out-patient program conducted by the District of Columbia government involving limited once-a-week contact. Following this experience plaintiff's performance raised no problems. He earned but did not take substantial amounts of accumulated leave, and his work performance resulted in various awards and commendations. There is no indication of any further alcoholic difficulties on the job until 1980. By this time plaintiff had accumulated some 300 hours of annual leave and 240 hours of sick leave.

In 1980, when plaintiff began not to turn up for work, no discipline was imposed for absences. Following a conversation with the Department of Labor counsellor in January, 1980, he was assisted in undergoing detoxification at a local hospital. He did not follow up on the hospital's aftercare treatment but did reenter the District of Columbia counseling program.

By 1981 plaintiff's absences had become a serious job problem for the Department. Indeed, he was absent most of January and by August, 1981, had had hundreds of hours of unscheduled leave that year. In August 1981, his immediate supervisor, Nancy Atherholt, warned plaintiff, placed him on leave control, and recommended that he discuss his problems with the Department's counseling officer. She was familiar with his 1977 alcoholic seizure and suspected that alcohol was the reason for his absences.

Absences again increased around Christmas of 1981. By February, 1982, plaintiff had been absent without leave 152 hours, including the entire two weeks between January 4 and January 15. In February, 1982, his suspension was formally proposed, and he was referred again to the employee counseling service, this time with a "firm choice" between discipline and treatment. Plaintiff's supervisor, Carl Gerig,[15] took a strong interest in his problem and escorted him to an initial counseling meeting at COPE, Inc., with which the Department of Labor had contracted for its counseling services.

The COPE counselor arranged for plaintiff to enter an intensive out-patient treatment program at the Kolmac Clinic in sub-

---

14. Expert testimony at trial indicated that an alcoholic seizure occurs only after many years of heavy drinking and is an indisputable sign of advanced end-stage alcoholism.

15. Gerig was the supervisor immediately above Ms. Atherholt in the hierarchy of the Department's Office of Solicitor, where Whitlock worked.

urban Silver Spring, Md. Whereas other programs for persons with advanced alcoholism usually started with a month of in-patient care in a hospital, the Kolmac Clinic had had success treating such patients on an out-patient basis, with several months of intensive evening sessions several times a week, followed by a long period of after-care combined with Alcoholics Anonymous. After plaintiff was detoxified at a hospital, he entered the Kolmac program in March 1982 fully sober. At the same time he began treatment with his own private psychiatrist.

In view of his full commitment at that time to a strenuous therapy program, the proposed suspension was reduced to a reprimand. Plaintiff was advised explicitly that "further incident may result in more serious disciplinary action, possibly removal." In June, plaintiff was released from the intensive Kolmac therapy to continue in an aftercare program, but he immediately quit and attended no aftercare sessions. Kolmac notified COPE, which tried to advise plaintiff's supervisor, Carl Gerig. However, Gerig was in the middle of being transferred to another city and could not be reached. Plaintiff had not authorized COPE to contact anyone except Gerig about his treatment. The COPE counselor also tried repeatedly to contact plaintiff to urge him to resume treatment but testified that she could not reach him even though he was at work during much of her efforts. Plaintiff's other supervisors, however, including Nancy Atherholt, found out unofficially that he had dropped out of the Kolmac program. No discipline was instituted at this time.

Shortly thereafter plaintiff's absences resumed and quickly became extensive.[16] In September 1982, Atherholt asked plaintiff to submit medical information from his doctor because of his excessive sick leave absences since quitting Kolmac. She also advised him of her willingness to discuss his personal problems in confidence. He did not respond.

In October 1982, Atherholt ordered plaintiff to undergo a fitness-for-duty examination. Shortly after her order, Atherholt learned that plaintiff was undergoing a second in-patient detoxification, for which she placed him on annual leave for two weeks. Plaintiff was subsequently examined by his own psychiatrist. In a December 1, 1982 letter to Atherholt, the psychiatrist indicated that he had been treating plaintiff for alcohol dependence since March 1982 and said that it was his opinion that plaintiff could continue work "if sober," noting, however, that plaintiff denied his absences were connected to drinking.

Because the psychiatrist recommended that plaintiff also undergo a general physical examination, a second fitness-for-duty examination was performed by a general practitioner. This physician's report wholly disregarded plaintiff's alcoholism and attributed his absences to job stress from understaffing in plaintiff's unit. The report indicated that while absent from work plaintiff performed community service work. Atherholt testified that she disbelieved this report but that based on it and the other report she had no basis to remove plaintiff as medically unfit for duty.

In January 1983, Gerig's new replacement, Lydia Leeds, tried to counsel plaintiff at a lunch meeting, but the subject of his alcoholism never came up, and he insisted he had only personal problems that he needed to work out on his own. At the end of January 1983, because plaintiff had accumulated 226 hours of absence without leave since August 1982, Atherholt formally reprimanded him. Both Atherholt and Leeds warned plaintiff that further absences could result in more severe discipline. They urged him to reenter treatment. Plaintiff did not return to Kolmac or any other counseling program.

In the next two months plaintiff was absent without leave another 96 hours. Atherholt formally proposed to fire him on

---

**16.** In July and August plaintiff took a total of 108 hours of sick and annual leave and 32 hours of AWOL. The AWOL time did not begin until late August.

March 17.[17] Plaintiff proposed a reassignment and also filed for disability retirement. On May 12, 1983, Leeds upheld his discharge. She rejected reassignment and said that his disability retirement application was inappropriate since his doctor had indicated he could return to work. Following his discharge, he telephoned COPE and was advised to enter the long-term alcoholic rehabilitation program at St. Elizabeth's. He did so, and the program proved effective. During his stay at St. Elizabeth's, he withdrew his disability application on the advice of counsel. Plaintiff appealed his discharge to the Merit Systems Protection Board, but it was upheld.[18]

This outline fails fully to indicate some of the difficulties encountered by the Department in dealing with plaintiff's condition. The Department adjusted plaintiff's hours to permit him to arrive early and leave early. At one point, it suggested possible transfer to a less stressful job, which plaintiff declined. In many ways it sought to encourage him to discuss his true difficulties but plaintiff remained secretive and evasive and apparently succeeded in misleading a doctor reporting on his fitness. Plaintiff's supervisors even enrolled him in further training courses in 1982 to capture his interest in sustained employment. They were at all times in a general way familiar with a need to accommodate to the difficulties of an alcoholic on the job.

It is clear from this review that the Department of Labor was tolerant but not as decisive at earlier manifestations of plaintiff's illness as personnel policies governing management of alcoholic employees indicate to be preferable if not required. The history of this case also illustrates complexities in federal service that may imperil effective employee management. Supervisors often rightly fear they will be sued if

they criticize an employee. In addition, with narrow exceptions, privacy laws forbid the disclosure to employers of information on an employee's alcoholism treatment without the employee's permission.[19] *See* 42 U.S.C. § 290ee–3; 42 C.F.R. Part 2. Functions as intimate and essential as counseling are contracted out to specialists, and within government itself counseling becomes a specialty. This specialization and diffusion of responsibility may impede dealing with alcoholic employees, particularly when considered in the light of the elaborate protections that surround carrying out any discipline upon nonprobationary federal employees.

It is plain that the Department of Labor treated George Whitlock with compassion and tolerance, and more patience than many employers would have shown. However, it is also apparent that the Department fell short of the statutory mandate for accommodating handicapped employees.

When plaintiff dropped out of the Kolmac program in June 1982, the "firm choice" requirement for dealing with alcoholic employees mandated that plaintiff be required to reenter that or another appropriate program immediately or face suspension or other serious disciplinary action. This was not done. Delays and indecision followed over the next several months, while plaintiff's attendance deteriorated further. This was understandable, given the shift in supervisors in his unit and plaintiff's denials of his true condition. Equitable relief would be inappropriate if this were the only misstep of the agency in the process of accommodating to plaintiff's handicap.

However, the agency's evaluation of whether plaintiff should be removed for

---

**17.** At that point, plaintiff's AWOL time since January 1982 totaled nearly 12 weeks.

**18.** In the decision, which became final on October 17, 1983, the Board found that the Department had adequately accommodated the plaintiff by its several offers of rehabilitative assistance. The Board did not specifically address

the reasonableness of the accommodation at the time of discharge.

**19.** In this case, Whitlock had given disclosure permission only as to Gerig. However, his dropout from treatment apparently became common knowledge at his office soon thereafter.

being medically unfit for duty based on his alcoholism—an evaluation that began with the October 1982 order that he undergo a fitness-for-duty examination—was seriously mishandled. The regulations require an agency to evaluate all the available evidence in deciding whether a disease is responsible for an employee's unacceptable performance. In this case, however, Atherholt made a negative finding based solely on the reports of examinations by a psychiatrist and a general practitioner. As she herself acknowledged, the latter report was wholly incredible, even bizarre. The psychiatrist's report plainly indicated plaintiff was fit for duty only if not drinking. Atherholt knew of plaintiff's two recent hospitalizations for drinking, his 1977 alcoholic seizure, and his temporary success at therapy in the Kolmac program. She had every reason to believe he was an alcoholic and was continuing to drink heavily. Based on the evidence available at that time to the agency, it is obvious that the agency should not have abandoned the fitness-for-duty process but should have made a tentative determination that his job deficiencies were caused by his alcoholism disease. That would have triggered the formal procedures for reasonably accommodating handicapped employees who can no longer perform their job duties, including an offer of an extended leave without pay for in-patient treatment, presumably at St. Elizabeth's or at the Veterans Administration, where he was also eligible. *See Doe v. Hampton*, 566 F.2d 265, 283–84 (D.C.Cir.1977), remanding a discharge based on inadequate fitness-for-duty examination and inadequate consideration of leave without pay.

■■■ This is not to say that in every instance where an agency confronts an alcoholic employee who has failed in treatment that it must offer leave without pay or some other specific arrangement. But if there is evidence, as there is here, that such a leave, providing opportunity to enter St. Elizabeth's or some other intensive alcoholism treatment program, might have been beneficial, the reasonable accommodation duty requires the agency to evaluate whether such a leave, or alternative arrangement, would have imposed an undue hardship on the agency. The agency made no such evaluation. Moreover, plaintiff has met his burden of showing evidence that he could have been reasonably accommodated by a leave without pay. Once an employee has shown evidence that his handicap can be accommodated, the burden of persuasion is on the agency to show that it cannot accommodate the employee. 29 C.F.R. § 1613.704; *Treadwell v. Alexander*, 707 F.2d 473, 478 (11th Cir.1983). The agency has failed to show undue hardship,[20] and thus it violated its duty to this handicapped employee.

■■■ In fashioning equitable relief for violations of affirmative-action duties to handicapped employees, a court "may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy." 29 U.S.C. § 794a(a)(1). Accordingly, the Court believes that reinstatement with back pay, as the plaintiff requested here, would be inappropriate in light of the fact that for a number of months after his discharge he was clearly incapable of work and also in light of his subsequent outside employment following discharge from St. Elizabeth's.

Given the circumstances, the Court believes the most appropriate remedy is to allow the plaintiff to reapply at the Department of Labor and promptly undergo a comprehensive fitness-for-duty examination at the Department's expense. The application for re-employment must be made within the next 30 days or plaintiff will be deemed to have waived his right to re-employment. The examination shall be con-

---

**20.** At trial there was testimony that the agency was under unusually tight budget constraints and other problems at the time of plaintiff's extensive absences, which made his deficiencies all the more problematic for his office. However, there was no evidence presented that granting him a leave without pay would have imposed an undue hardship on the agency.

ducted by a physician or physicians,[21] acceptable to the parties, who have no prior connection with plaintiff. Examination shall include assessment of the current status of his alcoholism, his mental acuity and his physical fitness for duty. If he is now found fit for re-employment in his prior position, or in another position at an equivalent or lower grade, the Department shall offer to rehire him at that grade. If not, the Department shall allow him to seek disability retirement as of the date of his application for re-employment.

**21.** A non-physician specialist such as a psychologist may be appropriate for certain aspects of the examination if the parties so agree.