Flannery, J.
The plaintiff has brought suit against her former employer, New England Telephone & Telegraph Company (“NET”), alleging she was terminated in violation of the handicap discrimination provisions of G.L.c. 151B §4(16). NET now moves for summary judgment.
BACKGROUND
The following undisputed facts are derived from the pleadings and affidavits of the parties.
Margery B. Picot (“Picot”) began her employment with NET in 1955 as a clerk in the Accounting Division where she worked for six years before resigning to devote time to raising her family. In 1978 she returned to NET as a general clerk and was employed there until her dismissal in 1985.
On April 8, 1980 Picot was involved in an on-the-job accident during which a tray from a decollating machine fell onto her right foot.[2] She stayed out of work for the remainder of 1980 and did not return to work until January 10, 1981.[3] Other lengthy periods of absence followed: April 16, 1982 through June 20, 1982 (46 days); October 18, 1982 through March 1, 1983 (111 days); April 26, 1983 through March 18, 1984 (235 days); and April 12, 1984[4] through August 11, 1985 (347 days). During each period of absence Picot was paid worker’s compensation benefits.
Picot’s high level of absenteeism triggered several warnings from NET. The first warning was issued verbally in February 1982. The second, written, warning was given on June 21,1982. Picot received a “final warning” on March 22, 1983.
Ultimately NET terminated Picot’s employment on August 25, 1985. For the five years preceding her dismissal, Picot’s attendance rate hovered under 30%. Her absenteeism rate totalled 70.2%.
At the time of the dismissal Picot was a member of the Accounting Bargaining Unit at NET and represented by the International Brotherhood of Electrical Workers, AFL-CIO (“Union”). As such, she was covered under the NET-Union collective bargaining agreement in effect from August 7, 1983 through August 9, 1986. Following the dismissal the Union pursued a grievance action, asserting on Picot’s behalf that she had been terminated without just cause. On August 18, 1988 the Board of Arbitration issued its decision denying the grievance. The Board found that Picot had failed to meet the requirements of her position, and concluded that in discharging Picot the defendant had not violated the collective bargaining agreement.[5]
DISCUSSION
It is well settled that summary judgment[6] is appropriate where it can be demonstrated that proof of an essential element of a nonmoving party’s claim is unlikely to be forthcoming at trial. Kourouvacilis v. GeneralMotors Corp., 410 Mass. 706, 711 (1991). With this standard in mind, I will consider Picot’s claim.
A. Qualified Handicapped Person under G.L.c. 151B §1
In order to prevail on a claim under G.L.c. 15 IB, a plaintiff must establish that he or she is a “qualified handicapped person,” that is, one who is able to perform the essential functions of the job or who would be capable of doing so if reasonable accommodation were made for the handicap. G.L.c. 151B §1.
Picot maintains that she is a “qualified handicapped person” because at the time she asked NET for a reinstatement to her position — June 1985 — she had completed a successful operation to repair her ruptured disc and was capable of returning to work on a full time basis and performing all essential job functions. For its part NET argues that this analysis is entirely too facile because it fails to take into account that for almost five years prior to this request Picot had failed to perform the “essential task” of reporting to work on a regular basis.
The analysis of Picot’s claim, therefore, turns on whether she was able to perform the essential functions of the job or would have been capable of doing so with reasonable accommodation.
As the defendant suggests, the decision of the Supreme Judicial Court (“SJC”) in Cox does provide guidance as to what constitutes a “qualified handicapped person” under c. 151B, §4(16).[7]
The plaintiff in Coxhad been employed by the phone company as a splice service technician when he was seriously injured in a motor vehicle accident which left him with a permanent brain injury affecting his memory, speech, and reading speed. The plaintiff returned to work in a clerical position and, though he applied repeatedly for reassignment to his former position, he never was able to pass the required pole-climbing course due to his reading and memory problems. Nonetheless, Cox contended he was a qualified handicapped person under c. 15 IB and sought a court order awarding him the technician position and money damages.
The SJC affirmed the Superior Court’s entry of judgment for the defendant, finding that the plaintiff was not a qualified handicapped[8] person under the statute because pole-climbing was an essential function of the technician position and plaintiff could not pass the required test.
While the Cox decision does not define precisely what constitutes an “essential function,” Chief Justice Liacos (in dissent) looked to the MCAD Guidelines which state:
“[EJssential functions” of a job are those activities which must necessarily be performed by an employee to accomplish the principal object(s) of the job. Guidelines: Employment Discrimination on the Basis of Handicap — Chapter 151B, 8 Mass. Discrimination L. Rep. 2004, 2008 (1986).
*82 Applying these guidelines to Picot’s situation, it is difficult to envision how, through her extended absences, she could have accomplished the “principal objects” of her job.
In addition to the SJC’s Cox decision, two recent federal decisions provide considerable guidance. The first, Tyndall v. National Educ. Centers, 31 F.3rd 209 (4th Cir. 1994), involved an instructor suffering from lupus erythematosus (an autoimmune disorder) who brought suit against her former employer alleging wrongful termination under the Americans with Disabilities Act (“ADA”).
The ADA provides that “(n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual...’’ 42 U.S.C. §12112(a). In Tyndall the plaintiff missed nearly forty days of teaching during a seven-month period. In attempting to demonstrate the unlawfulness of her termination, she pointed to the fact that she had received positive teaching evaluations from her employer. The court reasoned, however, that an evaluation of the quality of the plaintiffs performance does not complete the inquiry: rather,
|i]n addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis. Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee “who does not come to work cannot perform any of his job functions, essential or others.” Wimbley v. Bolger, 642 F.Supp. 481, 485 (W.D.Tenn. 1986), affd, 831 F.2d 298 (6th Cir. 1987). Therefore, a regular and reliable level of attendance is a necessary element of most jobs.
Tyndall at 213. The Tyndall court concluded, “(a]n employee who cannot meet the attendance requirements of the job at issue cannot be considered a ‘qualified’ individual protected by the ADA.” Id. Similarly, in the instant case Picot cannot be considered “qualified” for her position at NET and protected by the provisions ofc. 15 IB where she failed to come to work on a regular basis.
A second federal decision, Lemere v. Burnley, concerned an alcoholic plaintiff whose termination was prompted by her frequent unscheduled absences, difficulties with colleagues, and failure to comply with employer-sponsored treatment. Lemere, 683 F.Supp. 275 (D.D.C. 1988). In evaluating the lawfulness of the employer’s decision in light of the Rehabilitation Act, the court noted:
[A]n alternate rationale for its [employer’s] decision could be that plaintiffs two-year pattern of unscheduled absences removed her from the protections of the Rehabilitation Act as someone who had lost the status of a “qualified handicapped employee.” 29 C.F.R. sec. 1613.704(a). Plaintiffs unscheduled absences prevented her from following a regular work schedule under which she could “perform the essential functions” of her position, the minimum requirement for qualified handicapped employees . . . therefore, plaintiff was not covered by the Act.
Lemere at 280. Both these decisions teach that regular attendance is an essential job function. In light of Cox, Tyndall, and Lemere, Picot has failed to show she is a qualified handicapped person.
B. Reasonable Accommodation
Section 4(16) of c. 151B provides that where a handicapped person is unable to perform essential job functions courts must consider whether any reasonable accommodation by the employer would have enabled the person to perform. However, Coxmakes clear that reasonable accommodation does not require an employer to disregard or waive an employee’s inability to perform an essential function of the job. Cox at 383. Further, an accommodation cannot be deemed reasonable where it imposes “undue financial and administrative burdens” on an employer, Southeastern Community College v. Davis, 442 U.S. 397, 412 (1979), or calls for “a fundamental alteration in the nature of [the] program.” Id. at 410.
Common sense tells us that a reasonable accommodation is one which makes it possible for an employee to work, not one which excuses the employee’s inability or unwillingness to work. As an illustration, the Massachusetts Commission Against Discrimination (“MCAD”) Handicap Discrimination Guidelines provide:
[A] reasonable accommodation is an adjustment made in the way a job is done to accommodate the limitation imposed upon an individual by a handicap so as to enable him/her to do a job.
MCAD Guidelines, §11.C. Under the MCAD[9] scheme, suggested accommodations include changes and adjustments in work schedules and tasks, modification of job requirements, and the provisions of adaptive equipment. Id.
Thus, to accommodate a qualified handicapped individual is to provide that individual with a means by which to work. This is not what Picot sought: Rather than identifying an accommodation which would have enabled her to work, Picot now asks for retrospective “absolution” for a history of not having worked. In this way what she really seeks is a waiver of NET’S requirement of regular attendance.[10]
Regular attendance was an essential function of Picot’s job. NET has shown that satisfactory attendance was a specific requirement of Picot’s position and that, due to the high costs[11] of absenteeism, the defendant considered good and regular attendance to be an essential function of every job. Hahn Affidavit, paragraph 20. Moreover, NET instituted progressive discipline against employees who failed to meet regular attendance standards. Id. Finally, as I will discuss *83 below, the plaintiffs collective bargaining agreement with the Union called for good and regular attendance on the part of employees.
C. Collective Bargaining Agreement and Arbitration
1. Collective Bargaining Agreement
The terms of the collective bargaining agreement established that good and regular attendance was an essential function of Picot’s job, and, in addressing handicap discrimination issues, Massachusetts law gives considerable weight to the terms of collective bargaining agreements.
Section 75(B) of c. 152 defines an employee who has sustained a work-related injury as a “qualified handicapped person” under c. 151B. Further, it prohibits the discharge of such an employee when he or she files workers’ compensation claims. However, that statute also says that if “any right set forth in the section is inconsistent with the applicable collective bargaining agreement, such agreement shall prevail (emphasis added).” G.L.c. 152 §75(b)(3). Thus where, as here, an employee’s conduct violates the terms of the collective bargaining agreement, NET has cause under the statute to discharge that employee, and NET’S contractual rights shall prevail over Picot’s claim of handicap discrimination.
2. Arbitration
As I have mentioned above, Picot’s union-supported grievance action was arbitrated under the provisions of the collective bargaining agreement. The Board of Arbitration held that NIST’s attendance policy was well settled and that NET had the right to discipline an employee who failed to meet articulated job requirements.
Under the holding in Alexander v. Gardner-Denver, 415U.S. 36 (1974), the Supreme Court permits federal courts to consider arbitration decisions, admit them into evidence, and accord them such weight as the court deems appropriate. While the Board’s decision is not preclusive, it provides a sound analysis and interpretation of the terms of the collective bargaining agreement and is convincing in its finding that attendance is an essential function of the job.
It fairly can be said that Picot’s recognition of NET’S attendance policy was a custom “more honored in the breach than in the observance.” It would distort legislative intent and confound notions of fairness to hold that NET was obliged — by c. 15IB or any other statute — to tolerate Picot’s excessive absenteeism. NET lawfully dismissed Picot from employment and is entitled to summary judgment in its favor.
ORDER
It is hereby ORDERED that the defendant’s motion for summary judgment be ALLOWED.

Following the accident Picot needed a cane and crutches to get around. She alleges that the use of crutches aggravated her back. (Affidavit of Margery Picot, Paragraph 4.)

In recounting Picot’s many periods of absence I do not include the four periods during which she performed her duties on a part-time basis.

Picot underwent surgical repair of a ruptured disc on April 18, 1984.

The following excerpts are worth noting:
The Company hired the grievant [Picot] with the expectation that she would attend work regularly. The Board of Arbitration agrees with the Union that, under most circumstances, absences due to physical problems are viewed more leniently than absences that are for no reason and merely a willful refusal to work; however, there comes a time when even absences for the best of reasons or excuses become intolerable by their sheer excessive number. The grievant has reached the point of no return ... A prerequisite of a handicapped person to be able to claim a job is that they do possess [sic] the ability to come to work. A person who claims to be handicapped but cannot report to work in any reasonable degree of regularity is in effect asking to be given a job and be excused from attendance . . . The Board of Arbitration will not rule on whether the grievant is handicapped because she was not terminated because of any handicapped condition, but rather the grievant was terminated because she was absent to an excessive and intolerable degree.
American Arbitration Association. Opinion and Award, Case No. 1130-2279-85, pages 7-9.

By an order dated November 29,1988 this court (Murphy, J.) denied NETs first motion for summary judgment. While not addressing the issue of whether good and regular attendance is an essential job requirement, the court noted genuine issues of material fact precluding summary judgment.
On October 4, 1994 this court granted NET’S request to file a second motion for summary judgment. Through this motion NET asks the court to consider the facts of the instant case in light of the Supreme Judicial Court’s decision in Cox v. New England Telephone & Telegraph Co., 414 Mass. 375 (1993), as well as other federal decisions since 1988 interpreting the issue of good and regular attendance as an essential job function.

Because the Cox decision was the SJC’s first foray into interpreting handicapped discrimination under c. 151B, it did so in light of the analogous federal statute, §504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 (1988), and cases decided thereunder. Cox, 414 Mass. 375 (1993).

In affirming the Superior Court’s entry of judgment for the defendant the SJC noted:
As used in c. 151B, “[t]he term ‘handicap’ means (a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such an impairment; or (c) being regarded as having such impairment.”
Cox at 381.

Similarly, the ADA Guidelines provide that a “reasonable accommodation” may include: (1) modification of facilities; (2) job restructuring; (3) part time or modified work schedules, (4) reassignment to a vacant position; (5) acquisition or modification of equipment; (6) modification of examination training materials or policies; and (7) the provision of qualified readers or interpreters.

Picot presents no evidence of her ever having requested a leave of absence from NET, yet she argues that NET was wrong in allowing seven lengthy periods of absence to be counted against her for attendance purposes. The defendant is correct in suggesting that, rather than seeking an accom *84 modation as envisaged by the statute, what Picot requests is preferential treatment.

 Scot's argument that her absence did not cost the company money and presented no hardship to NET is both strained and disingenuous.

This motion is opposed.